IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs August 15, 2017 at Knoxville

## STATE OF TENNESSEE v. RICHARD W. SHELTON

**Appeal from the Circuit Court for Marshall County**
**No. 2016-CR-86    Forest A. Durard, Jr., Judge**

_____

**No. M2017-00240-CCA-R3-CD**

_____

Richard W. Shelton, the Defendant, was charged with one count of sale and one count of delivery of a Schedule II controlled substance. A Marshall County jury found the Defendant guilty as charged, and the trial court sentenced the Defendant to fifteen years with release eligibility after service of forty-five percent of the sentence in the Department of Correction. On appeal, the Defendant argues that there was insufficient evidence for a rational juror to have found him guilty of the offenses beyond a reasonable doubt and that his sentence is excessive and contrary to law. After a thorough review of the facts and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

William J. Harold, Lewisburg, Tennessee, for the appellant, Richard W. Shelton.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Robert J. Carter, District Attorney General; and Edward Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Factual and Procedural Background

On June 22, 2016, the Marshall County Grand Jury indicted the Defendant on charges of selling and delivering a Schedule II substance, morphine.

*Jury Trial*

At the Defendant's jury trial, Shawna Love testified that she had known the Defendant for about a month and had been messaging him on Facebook. On the morning of March 11, 2015, she and the Defendant exchanged text messages on their telephones. The text message exchange included the following:

[THE DEFENDANT]: Ok cool you said you was tired . . . so I was gonna say I had a tab[1] you could get . . . .

[MS. LOVE]: S\*\*t. Wouldn't that be amazing. I got f\*\*\*\*d up and got into a fight last night. F\*\*\*\*d up my elbow and some more s\*\*t. I'm sore as h\*\*l.

[THE DEFENDANT]: Well[,] hit me up when you get off we can hangout[.] [I']m trying to get some perks[,][2] you smoke to[o][,] right[?][3]

[MS. LOVE]: Yea[,] I smoke. I gotta try and get some money before I get off. It[']s bill week. . . . [Y]ou know how that be.

[THE DEFENDANT]: Yep[,] I feel ya[.]

[THE DEFENDANT]: Hey[.]

[THE DEFENDANT]: I got a perk [I']ll snort with you if you do that[.]

[MS. LOVE]: Was sup[?]

[THE DEFENDANT]: What you doing[?]

[MS. LOVE]: Just got off[,] about to do a few things then I'm free[.]

[THE DEFENDANT]: Well[,] I just got finished eating but getting in shower now so if you hit me up before [I']m done [I']ll hit you right back[.]

[MS. LOVE]: Okay love.

---

[1] It is unclear whether the "tablet" that the Defendant referred to was a legal or illegal drug.

[2] Ms. Love testified that "perks" referred to Percocet.

[3] Ms. Love testified that the Defendant was referring to smoking marijuana.

[THE DEFENDANT]: You coming over[?]

[THE DEFENDANT]: I got the house to myself and I got that perk and some dro[4] so we can smoke[.] [W]hat[']s up[?]

[THE DEFENDANT]: I need to sell some morphine[,] [d]o you know anyone[?]

[THE DEFENDANT]: [H]it me back when you see this[.]

[MS. LOVE]: I probably do[,] lemme see[.]

[THE DEFENDANT]: Okay[,] you gonna come chill with me . . . [?]

. . . .

[THE DEFENDANT]: If y[']all gonna come up to my apartment[,] come up to the 3rd and turn left first door on right #330[.]

[MS. LOVE]: Okay love[,] we got you.

At approximately 9 p.m. that evening, Ms. Love was stopped by the Seventeenth Judicial District Drug Task Force ("DTF") as she drove with her brother, Jesse Marshall, and two other passengers. The DTF found a gram of marijuana belonging to Ms. Love and marijuana and prescription pills belonging to Mr. Marshall. The DTF asked Ms. Love and Mr. Marshall to assist them with a controlled buy in exchange for declining to prosecute their drug charges. Ms. Love showed the DTF the text message exchange with the Defendant on her phone; she later identified copies of the messages in court. The DTF gave an audio recorder to Ms. Love and $100 buy money to Mr. Marshall to use in the controlled buy. Ms. Love called the Defendant as she, her brother, and DTF Agent Joe Ramirez were on their way to the Defendant's apartment "to let [the Defendant] know [Ms. Love] was on the way and also to confirm how many morphines [sic] [the Defendant] had to sell." Ms. Love, Mr. Marshall, and Agent Ramirez met the Defendant at his apartment and then drove to a nearby gas station so the Defendant could purchase cigarettes.

During the drive back to the Defendant's apartment complex, the group discussed the price of drugs. Ms. Love asked to purchase five morphine pills from the Defendant.

---

[4] Ms. Love testified that "dro" refers to marijuana.

- 3 -

The Defendant told Ms. Love, Mr. Marshall, and Agent Ramirez that he normally charged $15 per morphine tablet, but he offered to sell the tablets to the group for $10. The Defendant and Mr. Marshall got out of the vehicle and headed to the Defendant's apartment. After a few minutes, Agent Ramirez realized that Ms. Love needed to witness the sale of the morphine because she was carrying the audio recorder. Ms. Love decided that she would knock on the Defendant's door and ask to use his bathroom. Ms. Love did not observe any drugs while she was on her way to the bathroom, but when she left the bathroom, the Defendant stated that he could obtain more narcotics from his uncle. Ms. Love, Mr. Marshall, and Agent Ramirez then left the Defendant's apartment.

Ms. Love then identified an audio recording of her two phone calls with the Defendant before she, Mr. Marshall, and Agent Ramirez first arrived at the Defendant's apartment complex. Ms. Love identified the Defendant's voice on the recording stating that he had "five or six" and the discussion about the price of the morphine tablets.

On cross-examination, Ms. Love testified that she was never charged for possession of marijuana related to the search of her vehicle on March 11, 2015. Ms. Love agreed that she could not confirm that it was the Defendant who was texting her from the Defendant's phone number. She also agreed that it appeared that the Defendant was flirting with her in the text message exchange and that the Defendant had invited her over to use Percocet with him. Ms. Love agreed that she could not remember whether Mr. Marshall paid the Defendant for the morphine tablets in the vehicle or in the Defendant's apartment. On redirect examination, Ms. Love clarified that the Defendant's text message stating that he needed to sell some morphine was sent before she was stopped by the DTF. She also agreed that the text message discussing the sale of morphine was not flirtatious.

Jesse Marshall testified that he had previously met the Defendant a "time or two." On March 11, 2015, he and Ms. Love were stopped by the DTF. The DTF found a couple of grams of marijuana and seven or eight "Roxie" pills on Mr. Marshall; Mr. Marshall stated that he was not charged for possession of drugs related to this incident. Mr. Marshall agreed to assist the DTF, but he admitted that he was reluctant to participate with the controlled buy. Agent Ramirez gave Mr. Marshall $100 to use in the controlled buy. Like Ms. Love, Mr. Marshall testified that he, Ms. Love, and Agent Ramirez drove to the Defendant's apartment complex, picked up the Defendant, and drove to a gas station. Mr. Marshall stated that the Defendant exited the vehicle and purchased cigarettes at the gas station, and then the group returned to the Defendant's apartment complex. After arriving at the complex, Mr. Marshall recalled that he paid the Defendant $100 for the tablets while in the vehicle, and the Defendant stated that Mr. Marshall could come up to the Defendant's apartment to get the drugs. After the Defendant and Mr. Marshall entered the Defendant's apartment, the Defendant informed Mr. Marshall

- 4 -

that he only had five morphine tablets. The Defendant asked Mr. Marshall if he still wanted the drugs, and Mr. Marshall said yes. The Defendant gave Mr. Marshall the tablets and $50 in change. By this time, Agent Ramirez and Ms. Love had entered the Defendant's apartment. Mr. Marshall stated that he handed the tablets and $50 to Agent Ramirez as Ms. Love entered the Defendant's bathroom. The Defendant then informed Mr. Marshall that he could obtain more morphine tablets later. Ms. Love, Mr. Marshall, and Agent Ramirez said that they would purchase more drugs later and left the Defendant's apartment.

On cross-examination, Mr. Marshall testified that he was initially unwilling to cooperate with the DTF; however, Ms. Love convinced him to cooperate. Mr. Marshall agreed that he had been charged with sale of a Schedule II drug, which occurred on the same day as the Defendant's current offense; he agreed that this charge was later reduced to a misdemeanor. He testified that he was aware that Ms. Love and the Defendant had been texting earlier that day, but he was unaware of the tone of the conversation. Mr. Marshall stated that he thought he gave $100 to the Defendant at the gas station when the Defendant left the vehicle to purchase cigarettes, but he stated that he was uncertain.

Agent Joe Ramirez testified that he had worked for the Marshall County Sheriff's Department for almost three years in the DTF, which investigates "narcotics trafficking, narcotics production, narcotics sales and narcotics usage." Agent Ramirez testified that other DTF agents stopped Ms. Love and Mr. Marshall at approximately 7:45 p.m. on March 11, 2015. Agent Ramirez met with Ms. Love and Mr. Marshall and they agreed to assist the DTF with a controlled buy of morphine from the Defendant. Agent Ramirez asked Ms. Love and Mr. Marshall if they knew of individuals that they could purchase drugs from, and Ms. Love answered that she could purchase morphine from the Defendant. Ms. Love showed Agent Ramirez her text message exchange with the Defendant, and Agent Ramirez asked her to call the Defendant to confirm that she wanted to purchase morphine from him. The Defendant agreed to sell morphine to Ms. Love.

Agent Ramirez then searched Ms. Love, Mr. Marshall, and Ms. Love's vehicle to ensure that there was no contraband or money on their persons or in the vehicle. Agent Ramirez gave Ms. Love a recording device and $20 to purchase cigarettes and gave Mr. Marshall $100 for the controlled buy in marked bills. Agent Ramirez also wore a recording device. Agent Ramirez testified that he was aware of the Defendant's price per morphine tablet before the group left for the Defendant's apartment complex because he could overhear Ms. Love's phone conversations with the Defendant. Ms. Love then drove her vehicle, with Agent Ramirez and Mr. Marshall as passengers, to the Defendant's apartment complex. The group picked up the Defendant and then drove to a nearby gas station, where Ms. Love exited the vehicle and purchased some cigarettes for

the Defendant. The group drove back to the Defendant's apartment complex and discussed purchasing morphine tablets. Agent Ramirez testified that the Defendant "was talking to us about how he normally charges $15 a pill but that in this instance he was going to charge us $10 a pill. He said he charged anywhere between 15 and 12 in the past, but $10 [wa]s what he was charging us." Agent Ramirez stated that the Defendant informed the group that "he thought he had about [six] pills left." He also testified that "Mr. Marshall handed $60, three $20 bills to [the Defendant], and . . . since he was to [Agent Ramirez's] left, his arm reached over and handed him $60." Mr. Marshall handed the remaining $40 to Agent Ramirez. After Mr. Marshall gave $60 to the Defendant and the remaining $40 to Agent Ramirez, the Defendant told Mr. Marshall to go with him to the Defendant's apartment to get the morphine pills. Agent Ramirez stated that the Defendant did not invite himself or Ms. Love into the apartment at that time.

Approximately one to two minutes after the Defendant and Mr. Marshall left Ms. Love's vehicle, Agent Ramirez "[r]ealized that [he] had made an error in judgment and it was best that [he] was present or could witness the transaction [him]self." Agent Ramirez stated that Ms. Love came up with the idea that she would ask to use the Defendant's bathroom. Ms. Love knocked on the Defendant's apartment door, and the Defendant opened the door. After Agent Ramirez entered the Defendant's apartment, Mr. Marshall gave him five morphine tablets and $10. Agent Ramirez asked the Defendant if those pills were all he had, and the Defendant said yes but that he could get more pills later that day from his uncle. Agent Ramirez, Mr. Marshall, and Ms. Love then left the Defendant's apartment and returned to Ms. Love's vehicle. Agent Ramirez then submitted the pills to the DTF evidence custodian for testing.

On cross-examination, Agent Ramirez testified that, before he issued the buy money to Ms. Love and Mr. Marshall, he photographed the bills. He explained that he did not give Mr. Marshall a recording device because he assumed that the Defendant had the morphine tablets on his person and that the sale would occur in the vehicle; he was "was not aware [that] [the Defendant] was going to go back in his apartment to go get the pills." Agent Ramirez stated that he did not recover the $50 buy money that Mr. Marshall used to purchase the five morphine tablets from the Defendant because he decided against immediately making "follow-up contact" with the Defendant. On redirect examination, Agent Ramirez stated that he did not arrest the Defendant immediately after the controlled buy because he wanted to continue to use Mr. Marshall and Ms. Love as confidential informants.

Tim Lane testified that he was the Director and Evidence Custodian of the DTF. As the Evidence Custodian, Director Lane stated that he accepts sealed evidence from agents, logs the evidence into the evidence depository, and transports the evidence to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory. Director Lane testified

that he handled the evidence in this case, specifically the five morphine tablets seized by Agent Ramirez.

Jennifer Sullivan testified that she had worked as a Special Agent Forensic Scientist in the Forensic Chemistry Unit of the TBI Crime Laboratory for ten years. After the trial court declared Special Agent Sullivan an expert in the field of forensic chemistry, she stated that she tested the five tablets that Director Lane delivered to the TBI Crime Laboratory. She testified that, based on the markings on the tablets, she identified the tablets as "morphine [thirty] milligrams." Special Agent Sullivan stated that morphine is a Schedule II controlled substance. She then tested one tablet and confirmed that the tablet contained morphine.

After the trial court conducted a *Momon* colloquy, the Defendant decided against testifying. The jury found the Defendant guilty of sale and delivery of a Schedule II controlled substance, morphine.

*Sentencing Hearing*

At the Defendant's sentencing hearing on December 21, 2016, the trial court admitted the Defendant's presentence report and certified copies of the judgments of his previous convictions. Katie Haynes, the Defendant's girlfriend, testified that the Defendant had formerly worked with her and her mother in their cleaning business and exotic pet store. She also stated that, immediately prior to his arrest and incarceration, the Defendant was self-employed and "was doing construction for Mr. Dan Beck." Ms. Haynes stated that the Defendant was good with children but noted that the Defendant was addicted to pills. She testified that, if the Defendant received an alternative sentence, he could live at her house in Shelbyville with her mother and brother. Ms. Haynes stated that Mr. Beck had offered to rehire the Defendant or he could work for her again.

On cross-examination, Ms. Haynes said that she needed the Defendant to help her raise her child and help with housework and her business. She stated that the Defendant's children lived with the Defendant's aunt.

Tammy Swinney, the Defendant's sister, testified that the Defendant lived with her for almost two years after he was previously released from incarceration. She stated that, while the Defendant lived with her, he did not get into trouble and attended church regularly. She believed that the Defendant's "problems" began when he moved in with another woman. Ms. Swinney testified that, if the Defendant received an alternative sentence, he could live with her, her husband, and children in Columbia. Ms. Swinney also noted that the Defendant was good with her children and worked every day.

On cross-examination, Ms. Swinney testified that the Defendant did not use drugs while he lived with her "until the last little bit [when] he had started taking pills and sleeping a lot if he didn't have them." Ms. Swinney admitted that she knew that the Defendant was taking "something," but she did not believe that the Defendant had a drug problem at the time because she was not sure what kind of pills the Defendant was taking. Ms. Swinney was not aware that the Defendant owed approximately $50,000 in child support arrearage. She explained that the Defendant had custody of his children, although the children lived with the Defendant's aunt.

The trial court found that the Defendant was a Range III offender due to his prior felony convictions. The trial court noted that, besides the Defendant's five prior felony convictions that established his range, the Defendant had convictions for contempt, simple possession, assault, domestic assault, contributing to the delinquency of a minor, under-age drinking, and vandalism. The trial court also noted that the Defendant had nine violations of orders of protection and that his alternative sentences had been revoked numerous times. The trial court found that two enhancement factors applied, that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[]" and that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]" *See* Tenn. Code Ann. § 40-35-114(1), (8). The trial court gave both of these factors heavy weight. The trial court found that no mitigating factors applied to the Defendant's case. The trial court stated that the Defendant's case was "well beyond rehab" and ordered the Defendant to serve a fifteen-year sentence with release eligibility after service of forty-five percent of the sentence.

The trial court stated that it had considered the Defendant's presentence report, his social, mental, and physical history, the facts and circumstances surrounding the offense, the Defendant's potential of rehabilitation, whether the Defendant would abide by the terms of alternative sentencing, and the Defendant's risk of reoffending. The trial court found that the Defendant had "failed miserably every time he has been placed on some form of community release given the number of violations of probation he has [had]." The trial court also found that the Defendant would not abide by the terms of a probation agreement. Regarding whether the interests of society would be protected from possible future criminal conduct if the Defendant were incarcerated, the trial court found that the Defendant had "offended and re-offended many times." The trial court also found that the Defendant had "a number of unsuccessful attempts[]" at "measures less restrictive than confinement" and that confinement was suited to provide an effective deterrence in this case because "incarceration should provide some deterrence." The trial court ordered the Defendant to serve his sentence in confinement and that his sentence would run consecutively to any previous unserved sentences. The trial court merged count two,

delivery of a Schedule II controlled substance, with count one, sale of a Schedule II controlled substance. The Defendant filed a timely notice of appeal.

## II. Analysis

*Sufficiency of the Evidence*

On appeal, the Defendant argues that the evidence introduced at trial was insufficient for a rational juror to find him guilty of sale and delivery of a Schedule II controlled substance beyond a reasonable doubt and that the jury should have found him guilty of casual exchange. The State contends that "a rational jury could conclude that the [D]efendant knowingly sold and delivered a controlled substance[]" because the Defendant "planned and completed a drug transaction, even offering a discount and giving his customer change based on the amount sold."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"It is an offense for a defendant to knowingly[] . . . [d]eliver a controlled substance[] [or] [s]ell a controlled substance[.]" Tenn. Code Ann. § 39-17-417(a)(2)-(3) (2015). The sale or delivery of morphine, a Schedule II controlled substance, *see* Tenn. Code Ann. §39-17-408(b)(1)(I) (2015), "in an amount of less than point five (0.5) grams, is a Class C felony . . . ." Tenn. Code Ann. § 39-17-417(c)(2)(A) (2015).

In *State v. Donald L. Haynes*, this court addressed the differences between a sale and a casual exchange of drugs as the following:

> A "casual exchange" is an exchange made without design. *See State v. Helton*, 507 S.W.2d 117, 120 (Tenn. 1974). Such an exchange may include a transaction in which money is involved. *Id.* "[A] casual exchange is simply the transfer of drugs without the characteristics of bargaining, pecuniary motive, and design typical of a sale. Thus, a common example of a casual exchange is the spontaneous passing of a small amount of drugs at a party." *State v. Edward P. Harris*, No. 01C01-9810-CR-00392, 2000 WL 19536, at *3 (Tenn. Crim. App. Jan. 13, 2000). Whether a transfer is a casual exchange is to be determined from all the facts and circumstances of the case. *Helton*, 507 S.W.2d at 120-21. Facts and circumstances indicating that the transaction is not a casual exchange include a lack of evidence that the defendant gave the drugs to the buyer out of friendship or as a friendly gesture, *see State v. Jack Allison*, No. 01C01-9402-CC-00061, 1995 WL 60006, at *4 (Tenn. Crim. App. Feb. 14, 1995); no evidence reflecting anything other than a pecuniary motive for the transfer of the drugs, *see Harris*, 2000 WL 19536, at *3; no prior relationship between the defendant and the buyer, *see id.*; and no reason for the defendant and the buyer to be together, other than for the buyer to purchase drugs, *see State v. Eric Larez*, No. 03C01-9810-CR-00379, 1999 WL 997514, at *4 (Tenn. Crim. App. Nov. 4, 1999).

No. E2000-00672-CCA-R3-CD, 2001 WL 416729, at *4 (Tenn. Crim. App. Apr. 24, 2001), *perm. app. denied* (Tenn. Oct. 1, 2001).

When viewed in the light most favorable to the State, the evidence introduced at trial establishes that, after texting Ms. Love about smoking marijuana and taking Percocet, the Defendant asked if she knew anyone who wanted to purchase morphine. Prior to the offense, Mr. Marshall had only met the Defendant a few times. Shortly after that message exchange, Ms. Love and Mr. Marshall were stopped by the DTF, and they agreed to assist the DTF. Ms. Love then called the Defendant to confirm that she wanted to purchase some morphine tablets. After picking up the Defendant and stopping to purchase cigarettes, the Defendant told Ms. Love, Mr. Marshall, and Agent Ramirez that he normally charged $15 per morphine tablet, but he offered to sell the tablets to the group for $10; the Defendant acted with a pecuniary motive and his offer was typical of a sale. Mr. Marshall, who had not been communicating with the Defendant regarding smoking marijuana or taking Percocet, paid the Defendant $60 for six morphine tablets and accompanied the Defendant to his apartment to obtain the tablets. Mr. Marshall testified that the Defendant gave him five morphine tablets and $10 in change. Agent

Ramirez then realized that Mr. Marshall did not have a recording device, and he and Ms. Love entered the Defendant's apartment, where Mr. Marshall gave Agent Ramirez five loose tablets and $10. While Agent Ramirez did not personally observe the Defendant give Mr. Marshall the tablets, Mr. Marshall testified that he received the tablets from the Defendant and immediately handed them to Agent Ramirez. Further, Ms. Love, Mr. Marshall and Agent Ramirez all testified that the Defendant stated that he could obtain more morphine tablets from his uncle later that day.

The jury also heard proof of the Defendant's friendly text message exchange with Ms. Love prior to the incident. It was within the jury's purview to reject the Defendant's theory of casual exchange and to convict the Defendant of sale and delivery of a Schedule II drug. Not only did the Defendant establish the price of the morphine tablets, by offering the tablets for a discount, but he also sold the drugs to Mr. Marshall, who had only met him a few times previously and did not have an established relationship with the Defendant. The evidence introduced at trial was sufficient for a rational juror to have found the Defendant guilty beyond a reasonable doubt of sale and delivery of a Schedule II controlled substance. The Defendant is not entitled to relief on this ground.

*Excessive Sentence*

The Defendant also contends that his sentence of fifteen years with a forty-five percent release eligibility is excessive and contrary to law. More specifically, he argues that the trial court should have sentenced him to "something closer to the minimum for the range and granted some form of alternative sentence, preferably one with a strong drug rehabilitation component." He states that "[t]he trial court erred by placing too much weight on [the Defendant's] record and probation violations, and not giving weight to what the [trial] court considered to be a situation in which a guy was flirting with a girl and the support system that has developed since the incident." The State asserts that "the trial court articulated a reasoned basis for imposing a within-range sentence based on appropriate enhancement factors."

**Standard of Review**

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). "[A] trial

court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." *Bise*, 380 S.W.3d at 709. Moreover, under those circumstances, this court may not disturb the sentence even if it had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2015); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2015).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2015); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2015), Sentencing Comm'n Cmts.

### *Sentence Length*

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2015).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2015); *see also Bise*, 380 S.W.3d at 699 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

Here, the Defendant was convicted of sale and delivery of a Schedule II controlled substance, a Class C felony. *See* Tenn. Code Ann. § 39-17-417(c)(2)(A) (2015). The trial court found that the Defendant was a Range III offender; a Range III sentence for a Class C felony is "not less than ten (10) nor more than fifteen (15) years[.]" Tenn. Code Ann. § 40-35-112(c)(3) (2015). The trial court ordered the Defendant to serve a fifteen-year sentence. Because the trial court properly applied the purposes and principles of our Sentencing Act and because this sentence was within the statutorily-applicable range, it is afforded a presumption of reasonableness, and this court will not overturn it absent an abuse of discretion.

The trial court found that two enhancement factors applied, that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[]" and that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]" *See* Tenn. Code Ann. § 40-35-114(1), (8) (2015). The trial court noted that, besides the Defendant's five prior felony convictions that established his range, the Defendant had convictions for contempt, simple possession, assault, domestic assault, contributing to the delinquency of a minor, under-age drinking, and vandalism. The trial court also noted that the Defendant had nine violations of orders of protection and that his alternative sentences had been revoked numerous times. The trial court gave both of these factors heavy weight and found that no mitigating factors applied.

We conclude that the trial court did not abuse its discretion by sentencing the Defendant to fifteen years. The presentencing report clearly establishes that the

Defendant has an extensive criminal record; the Defendant has two contempt of court convictions, two Schedule II drug offense convictions, two assault convictions, six domestic violence convictions, three Schedule VI drug offense convictions, and one conviction of vandalism. The Defendant has also been convicted of contributing to the delinquency of a minor, underage drinking, and bringing contraband into a penal facility. The record also establishes that the Defendant has previously failed to comply with the conditions of his release into society. The Defendant is not entitled to relief on this ground.

### *Manner of Service*

"A defendant shall be eligible for probation under this chapter if the sentence actually imposed upon the defendant is ten (10) years or less . . . ." Tenn. Code Ann. § 40-35-303(a) (2015). "To be eligible for community corrections under Tenn[essee] Code Ann[otated] [section] 40-36-106(c), a defendant must first be eligible for probation under Tenn[essee] Code Ann[otated] [section] 40-35-303." *State v. Kendrick*, 10 S.W.3d 650, 655 (Tenn. Crim. App. 1999).

Here, the trial court ordered the Defendant to serve his sentence in confinement after finding that the interests of society would be protected from possible future criminal conduct if the Defendant were incarcerated because the Defendant had "offended and re-offended many times[,]" that the Defendant had "a number of unsuccessful attempts[]" at "measures less restrictive than confinement[,]" and that confinement was suited to provide an effective deterrence in this case because "incarceration should provide some deterrence."

Because the trial court ordered the Defendant to serve a sentence of fifteen years, he was not statutorily eligible for probation or community corrections under the "special needs" provision. The Defendant was not eligible for community corrections under Tennessee Code Annotated section 40-36-106(a)(1) because he has a past pattern of behavior indicating violence and he has demonstrated a pattern of committing violent offenses, namely, his two assault convictions and six domestic violence convictions. *See State v. Noah Keith Tipton*, No. E2014-02531-CCA-R3-CD, 2015 WL 9015989, at *5 (Tenn. Crim. App. Dec. 15, 2015), *no perm. app. filed* (the defendant's prior assault and domestic violence charges made him ineligible for community corrections under Tenn. Code Ann. § 40-36-106(a)(1)(E)). The Defendant is not entitled to relief on this ground.

### III. Conclusion

We conclude that the evidence was sufficient for a rational juror to have found the Defendant guilty beyond a reasonable doubt of sale and delivery of a Schedule II

controlled substance, morphine. We also conclude that the trial court did not err in sentencing the Defendant to serve a sentence of fifteen years with a forty-five percent release eligibility in the Department of Correction. For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE